IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


JOSE RODRIQUEZ ANTUNEZ,

          Plaintiff,

vs.                                  Civ. No. 05-1117 JB/ACT


JO ANNE B. BARNHART,
**Commissioner of Social Security,**

          Defendant.


**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**[1]

    **THIS MATTER** comes before the Court upon Plaintiff's Motion to Reverse or Remand the Administrative Agency Decision filed May 9, 2006. [Docket No. 13.]  The Commissioner of Social Security issued a final decision denying benefits finding that Plaintiff was not disabled. Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court finds that the Motion is well taken and should be granted.

**I.  PROCEDURAL RECORD**

    1.     Plaintiff, Jose Rodriquez Antunez, filed an application for Social Security Disability Insurance Benefits ("DIB") on September 8, 1999.  Tr. 103-05.  He alleged that he was disabled since February 10, 1999 due to back problems.  Tr. 103, 115.  His application was denied at the initial and reconsideration level.

---

[1] An Order of Reference was filed June 21, 2006.  [Docket No. 17.]

2.      The Administrative Law Judge ("ALJ") conducted a hearing on January 20, 2004.  Tr. 315.  At the hearing, Plaintiff was represented by an attorney.  On July 23, 2004, the ALJ issued an unfavorable decision.  Tr. 22-28.  The ALJ found at step four that Plaintiff could perform his past relevant work as a recreation aide.  Tr. 28.  On September 21, 2004, Plaintiff filed a request for review with the Appeals Council.  Tr. 37-38.  On April 27, 2005, the Appeal Council issued its decision declining review of the ALJ's decision.  Tr. 10.  Thus, the ALJ's decision is the final decision of the Commissioner.  20 C.F.R. § 404.984(a) & (d).  Plaintiff filed his Complaint for judicial review of the ALJ's decision on October 21, 2005.

3.      Plaintiff was born on August 7, 1968 and was thirty-five years old at the time the ALJ issued her decision.  Tr. 23, 103.  He has a GED.  Tr. 121.  He was previously employed as a fish processor, cook, youth activity supervisor and soccer team organizer.  Tr. 124, 319-20.

## II.  STANDARD OF REVIEW

4.      The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F.2d 1045, 1047 (10th Cir. 1993)  (quoting *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (citation omitted)).  A decision of an ALJ is not supported by substantial evidence if other evidence in the record overwhelms the evidence supporting the decision.  *See Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

5.      In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve

months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C.

§423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (1993).  The regulations of the Social

Security Administration require the Commissioner to evaluate five factors in a specific sequence in

analyzing disability applications.  20 C.F.R. § 404.1520(a-f).  The sequential evaluation process ends

if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

        6.      At the first four levels of the sequential evaluation process, the claimant must show:

1)  he is not engaged in substantial gainful employment; 2)  he has an impairment or combination of

impairments severe enough to limit his ability to do basic work activities; 3)  his impairment meets

or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R.

Part 404, Subpt. P, App. 1; or 4) he is unable to perform work he had done in the past.  20 C.F.R.

§§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the

Commissioner to show the claimant is able to perform other substantial gainful activity considering

his residual functional capacity, age, education, and prior work experience. *Id*.

### III.  MEDICAL HISTORY

        7.      On February 10, 1999, Plaintiff sustained a work related injury when he was lifting

a heavy case of crabs .  Tr. 156.  On March 1, 1999, his treating physician, Jonathan L. Franklin,

M.D., found that Plaintiff had sustained a thoracolumbar sprain and parascapular sprain of the right

shoulder.  *Id*.  He found that Plaintiff was not at that time able to work and prescribed physical

therapy. On May 29,1999, Plaintiff underwent an MRI of the lumbar spine which showed  discal

convexity of L4-L5 without radiculopathy and arthrosis in the articular facets, bilateral at L5-S1.  Tr.

157. Plaintiff was seen by a neurologist, Luis Manuel Franco Gutierrez, M.D., on June 19, 1999 who

upon "neurological exploration [] only found a discreet hyperreflexia."  Tr. 161.   A CAT scan of

Plaintiff's skull was taken on June 25, 1999,which was normal.  Tr. 165.

8.     Plaintiff underwent a neurological examination by Miguel Angel Rubalcava, M.D. on July 23, 1999. Tr. 167-68.  He was still having pain in the thoraco-lumbar area. Dr. Rubalcava felt that he had a "[p]robable lesion of the cervical spine."  Tr. 168.

9.     In 2000, Plaintiff continued to seek treatment for his back pain.  Tr. 270.  On March 2, 2000 a myelography was performed and showed "changes due to a discal protrusion, posterolateral, left, at L4-L5."  Tr. 175.  In April, Plaintiff was hospitalized for two days with a diagnosis of a herniated disk at L4-L5 and protrusion at L5-S1.  Tr. 177.  In May of 2000, another MRI of the lumbar spine was performed showing "discal bulging at L4-L5, without radicular compromise."  Id.  Plaintiff was given "muscle relaxants, NSAID's, as well as antineuritic and antispasmodic agents."  Id.

10.    In February of 2001, Plaintiff underwent an EMG which showed "left polyradiculopathy at L4, L5 and S1 with probable left nerve-root involvement at L2 and L3  Tr. 228. Plaintiff underwent another MRI on November 23, 2001 which showed "myelitis in the dorsal-medial side as well as to the right of T5-T6 to T8..."  Tr. 251.  A cervical EMG was performed on March 25, 2002 which was abnormal.  Tr. 276.

11.    On May 28, 2002, Plaintiff had surgery for abdominal sepsis caused by a perforated gastric ulcer.  Tr. 256.

12.    On March 18, 2003 Plaintiff was diagnosed with "[p]artial spinal cord syndrome with T9 topography of the postero-lateral cord, secondary to post-traumatic myelitis."  Tr. 279.

13.    In November of 2003, Plaintiff underwent surgery for herniated discs between C3-C4 and C4- C5.  Tr. 392.  Plaintiff was prescribed a permanent neck brace which he testified at the

4

hearing that he still wore.  Tr. 300, 323.

14.     The record also contains medical records concerning Plaintiff's mental status.  In June of 1999, Dr. Franco suggested that Plaintiff consult a psychiatrist.  He felt that Plaintiff was impaired in sensory perception which indicated the start of a psychiatric problem.  Tr. 161-62.  The next month, Dr. Rubalcava, a neurosurgeon, diagnosed Plaintiff with an anxiety syndrome.  Tr. 168.  In September of 1999, Plaintiff reported that he was prescribed amytriptyline by Dr. Rubalcava.

15.     A consultative examination was performed by Jose Alfonso Hernandez Romo, M.D., a psychiatrist, on January 26, 2000.  Tr. 172-74.  He diagnosed Plaintiff with a dysthymic disorder, with atypical symptoms.  Tr. 173.  However, he found Plaintiff was capable of doing simple jobs and following instructions.  *Id*.  On January 13, 2000, Neol Diaz Munoz, M.D., an internist, diagnosed Plaintiff with an anxiety disorder.  Tr. 270.  Plaintiff reported in June of 2000 that he had been prescribed diazepam.

16.     On June 19, 2000, a non-examining consultant completed a Psychiatric Review Technique form.  Tr. 187-195.  He found that Plaintiff was suffering from an affective disorder and an adjustment disorder with depression that was not severe.  Tr. 187.  A second Psychiatric Review Technique form was completed by a different non-examining consultant on January 24, 2001.  Tr. 205-18.  That consultant also found that Plaintiff was suffering from an affective disorder, dysthymic disorder that was not severe.  Tr. 205.

17.     In March of 2003, Plaintiff was prescribed clonazepam by his neurosurgeon,  Mario Flores, M.D. Tr. 282.  In September of 2003, Plaintiff's treating physician, Roberto Lopez Calderon, M.D., wrote that Plaintiff has "manifested a depressive syndrome, reactive, chronic, with an intense painful picture and occasionally he has presented psychotic outbursts, and for that reason he requires

Observation and treatment by a Psychiatrist."  Tr. 301.

18.    In January of 2004, Plaintiff reported that he was taking paxil and diazepam for depression.  Tr. 151.

## IV. DISCUSSION

19.    Plaintiff asserts that the ALJ erred in finding that he did not suffer from a severe cervical impairment; in failing to consider the combined effect of his physical and psychological impairments; in finding that he could perform a full range of light work; in her hypothetical given to the vocational expert; in failing to develop the record as to whether he was illiterate; and in failing to make findings at step four.  As the Court will remand this matter on several grounds, it need not address all of the errors alleged.

Treating physician.

20.    Under the treating physician rule, the Commissioner generally gives more weight to treating physicians' opinions than to non-treating physicians opinions. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  An ALJ is required to assign the opinion of a treating physician controlling weight if it is both: (1) well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) consistent with other substantial evidence in the record. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); 20 C.F.R. § 404.1527(d)(2).

21.    If a treating physician's opinion is not entitled to controlling weight, "treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§§] 404.1727 and 416.927." *Watkins*, 350 F.3d at 1300.  The factors are:  length of the treatment and the frequency of examination; the nature and extent of the treatment relationship,

6

including the treatment provided and the kind of examination or testing performed; the degree to which the physician's opinion is supported by relevant evidence; consistency between the opinion and the record as a whole; whether or not the physician is a specialist in the area upon which the opinion is rendered; and other factors brought to the ALJ's attention, which tend to support or contradict the opinion. *Watkins,* 350 F.3d at 1301.

22.     "Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons ...for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Id*. at 1300. "[I]f the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Id*. at 1301(citations omitted).

23.     In the decision in this case, the ALJ wrote:

> while the treating opinions have been considered they have not been accorded controlling weight because these sources did not have access to the record in its entirety. Additionally these sources are not familiar with particulars of the Social Security program to render a determination of disability as set forth under the Social Security Act (Social Security Ruling 96-5p). Tr. 26.

Clearly, this reasoning does not meet the legal standards stated above. The ALJ in two conclusory sentences rejected the opinions of all of Plaintiff's treating physicians. The ALJ failed to give specific reasons for doing so. In addition, the ALJ failed to state legitimate reasons for rejecting opinions of Plaintiff's treating physicians. Instead, she assumed that his physicians did not have the complete record and they lacked knowledge of the Social Security Act. These statements are speculative conclusions by the ALJ and are not supported in the record. Moreover, they do not reflect the required standards in determining what weight to assign the treating physicians' opinions. For

example, the ALJ did not determine whether the opinions were well-supported by medically acceptable clinical and laboratory diagnostic techniques or inconsistent with the other substantial evidence in the record.  In addition, the ALJ failed to articulate any of the pertinent factors in the regulations.  Finally, the ALJ did not specify what lesser weight, if any, should be assigned to the medical opinions.  This was reversible error.

Step 2.

24.     Plaintiff asserts that the ALJ erred in not finding that Plaintiff had a severe cervical impairment.  At step two, the claimant must show that he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities.  20 C.F.R. § 404.1520(c). Basic work activities are "abilities and aptitudes necessary to do most jobs," 20 C.F.R. § 404.1521(b), including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting."  *Social Security Ruling* 85-28, 1985 WL 56856 at *3.

25.     At step two, the ALJ must apply a *de minimus* standard to determine whether an impairment significantly limits the claimant's ability to do basic work activity.  *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).   But the mere presence or diagnosis of a condition is not sufficient to make a step-two showing.  *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997).  In determining whether a severe impairment exists, the Commissioner considers the "effect" of the impairment.  20 C.F.R. § 416.920(a).  Congress specifically noted that a "physical or mental impairment must be of a nature and degree of severity sufficient to justify its consideration as the cause of failure to obtain any substantial gainful work."  *Williamson v. Barnhart*, 350 F.3d 1097,

1100 (10th Cir. 2003), citing, S.Rep. No. 1987, 83d Cong., 2d Sess., reprinted in 1954 U.S. Code

Cong. & Ad. News 3710, 3730.

26.     In the ALJ's analysis at step two she did not mention Plaintiff's cervical impairment.

Her step two findings were:

> The medical evidence indicates that the claimant has degenerative arthritis of lumbar spine, and status post lumbar surgery impairments that are "severe" within the meaning of the Regulations... Tr. 24.
> The claimant's degenerative arthritis of lumbar spine, status post lumbar surgery and dysthymia disorder are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(c).[2]  Tr. 28.

27.     The ALJ did note that the Plaintiff was hospitalized for a herniated disc at C3-C4, C4-

C5  and had surgery.  Tr. 25.  The ALJ further noted one of Plaintiff's treating physicians opined

Plaintiff was permanently disabled, could not travel for "significant distances and that his condition

was not expected to improve after surgery." Tr. 26.  However, there is nothing in the ALJ's decision

that demonstrates that she specifically considered whether Plaintiff's cervical problems were severe.

This, too, is reversible error.

Combination of impairments.

28.     Plaintiff asserts that the ALJ erred in not considering Plaintiff's physical and

psychological impairments in combination.  As previously indicated, the ALJ made inconsistent

findings regarding Plaintiff's mental status.  The ALJ wrote that there was "no evidence supporting

the existence of affective or anxiety -related impairments." Tr. 24.  The ALJ further wrote that "[t]he

record is absent of therapy or psychiatric treatment notes supporting (sic) the claimant has received

---

[2]   The Court notes the inconsistency in the ALJ's decision regarding Plaintiff's alleged mental impairment.  In the portion of the decision entitled "Evaluation of the Evidence" the ALJ discusses Plaintiff's mental status and finds that his dysthymia is not severe.  Tr. 24. In the "Findings" portion the ALJ writes that Plaintiff's dysthymia is severe.

treatment for depression or anxiety further suggesting the impairment is not severe in nature (Exhibits 7F, 9F)." Tr. 24.  However, in Finding No. 3, the ALJ states that Plaintiff's dysthymia disorder is severe.  Tr. 28.   In her hypothetical to the vocational expert, the ALJ only included exertional limitations.  Tr. 331.

29.    At step two, the ALJ must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.  If the claimant's combined impairments are medically severe, the Commissioner must consider "the combined impact of the impairments...through the disability determination process."  *Id.*

30.    On remand, the Commissioner is directed to address the inconsistency in the ALJ's decision and if appropriate, consider the combined effect of all of Plaintiff's impairments.

Duty to develop the record.

31.    Plaintiff alleges that the ALJ erred in failing to fully develop the record as to whether Plaintiff was literate.  Illiteracy is defined in the regulations as:  "the inabilty to read or write....[S]omeone [is] illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling."  20 C.F.R. § 404.1564(b)(1).  The regulations also explain the importance of literacy:

> Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English, to do a job, regardless of the amount of education the person may have in another language.  Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. 20 C.F.R. § 404.1565(b)(5).

32.    The record shows that a Spanish interpreter was used at the administrative hearing.

10

Tr. 318.  When asked if he could speak English, Plaintiff responded "[n]ot very good."  Tr. 319.  The ALJ did not make any further inquiry at the hearing.  The Plaintiff did testify that he attended school in Mexico to the ninth grade, that the GED exam was in Spanish, and that he had to write the answers in English.  Tr. 328.  The Court notes that it appears  the Plaintiff signed but did not complete the Disability Report Adult, Tr. 114-31 and the Reconsideration Disability Report, Tr. 136-39.

33.      In assessing Plaintiff's credibility the ALJ wrote that "[t]he records show the claimant has a general equivalency diploma and during the hearing he was observed to understand and answer questions in English suggesting that he did not require a Spanish interpreter."  Tr. 26.  This is the ALJ's sole finding regarding Plaintiff's literacy.  The ALJ did not inquire fully regarding Plaintiff's literacy and did not make a specific finding.  Clearly, Plaintiff's literacy was an issue in this matter and the ALJ's failure to more fully develop the record and make a specific finding is error.

34.      As the Court has found that the ALJ committed reversible error at step two, the Court need not address Plaintiff's remaining arguments that the ALJ erred at step three and four.  The Court notes, however, that on remand the ALJ must make specific findings at each step of the sequential process so that the decision is capable of meaningful review.  *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (holding "[i]n the absence of ALJ findings supported by specific weight of the evidence, we cannot assess whether relevant evidence supports the ALJ's conclusion," and thus the ALJ's unexplained conclusion was "beyond meaningful review"); *Kepler v Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (holding ALJ's listing of factors he considered was inadequate when court was "left to speculate what specific evidence led the ALJ to [his conclusion]")).

## RECOMMENDED DISPOSITION

I recommend finding that Plaintiff's Motion to Reverse or Remand the Administrative Decision be granted with proceedings consistent with the proposed findings and recommended disposition.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to § 636(b)(1)(C), file written objections to such proposed findings and recommendations with the Clerk of the United States District Court, 333 Lomas N.W., Albuquerque, New Mexico 87102. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

ALAN C. TORGERSON
UNITED STATES MAGISTRATE JUDGE